**SO ORDERED: December 11, 2009.**





**Anthony J. Metz III**
**United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| REBECCA JANE TAYLOR, | ) | CASE NO. 06-7856-AJM-7 |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| Richard L. Smith, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Adv. Pro. 07-50650 |
| vs. | ) | |
| | ) | |
| Rebecca Jane Taylor, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

This matter was tried before the Court on October 28, 2009.  The Plaintiff,

Richard Smith ("Smith") appeared in person and by counsel, Bret Clement; the

1

Defendant, Rebecca Taylor ("Rebecca"), appeared in person and by counsel, Michael Farrer and Edward Hopper. The Court heard the evidence presented and the oral arguments of the parties. At the conclusion of the trial on October 29th, the Court found that Smith did not prevail on his complaint and that Rebecca should not be denied a discharge of her debts. The Court now makes its written findings and conclusions, as follows:

## FINDINGS OF FACT

1.      Prior to June, 1995, Rebecca was president of and owned a majority interest in Valor Entertainment Corp. ("Valor"). Valor owned and operated a tavern at 1106 East 53rd Street in Anderson, Indiana (the "Tavern") sometimes referred to as the "VIP Show Club". The real estate upon which the Tavern was located was subject to a mortgage held by Roger Frazier. There was conflicting evidence as to the outstanding balance owed on the mortgage but the evidence established that between $87,000 and $250,000 was owed.

2.      Both Rebecca and her husband, Larry Taylor ("Larry") worked full time at the GM Chevrolet Plant in Indianapolis. They both retired from their jobs in late 1999 or early 2000 after 30 years of employment there.

3.      Larry loaned money to Valor and on October 19, 1994, Valor, by its president, Rebecca, signed a promissory note wherein it promised to pay Larry the sum of $119,084.00 in monthly installments of $2500 at 18% interest until the loan was paid in full. The promissory note provided in part that:

        If for any reason the Vip/Valor Entertainment Corp. does not pay payments and does not pay payment for six months, the Property at 1106 E. 53rd Street Anderson, Indiana will be turned over to Larry T. Taylor. Also the Liqour (sic) License and all the

2

equipment will also be the property of Larry T. Taylor.  Larry T. Taylor must take over the Mortgage from Roger Frazier.

4.      Valor defaulted on the installment payments and, on June 2, 1995, on the advice of Larry's counsel, Valor transferred its interest in the Tavern and the personal property therein to Bearvon Corporation ("Bearvon"), a corporation owned by Larry.  Larry also assumed payment under the mortgage held by Roger Frazier.

5.      In March, 1995, a few months *before* the transfer of the Tavern from Valor to Bearvon, Smith and Rebecca entered into an oral agreement whereby Smith agreed to loan Rebecca up to $50,000 in exchange for a 48% ownership interest in the Tavern. Between March 12, 1995 and October 22, 1995, Smith loaned money or paid for improvements to the Tavern totaling $40,000.  Smith loaned an additional $10,000 after October, 1995 but before January, 1998.  As of the date of the transfer in June, 1995, Smith had loaned approximately $20,000 of the $50,000 he agreed to advance to Rebecca.

6.      At the time of the transfer, Brian Eads asserted that he was a minority shareholder in Valor, holding a 48% interest.  Rebecca maintained at trial that Eads never owned any part of the Tavern because he failed to pay for his shares.  Eads sued Rebecca for his shares in late 1995 but Rebecca successfully defended that lawsuit and it was determined that Eads never had an ownership interest in Valor.

7.      The evidence presented at trial showed that management of the Tavern changed little, if any, after the transfer to Bearvon and there was no interruption of the business. Rebecca testified that, after the transfer, Larry made the management and financial decisions concerning the business and hired the managers but that she continued her

3

management of the Tavern's day to day activities by having access to the safe, keeping the books, cleaning, supervising the receipts and cash and paying the bills. Rebecca testified that she was still working full time at the GM Plant and that she did not receive any wages, salary or income of any type from, or in connection with, the Tavern after the transfer.

8.     Rebecca testified that she owned World Finance, a mortgage business, that ceased business operations in 2001. Larry Fritz testified that in the summer of 1997, he gave Mike Benjamin, who worked for World Finance, $50,000 to invest in an overseas money market. By September or October of that year, Benjamin had left World Finance. Fritz testified that he had not known Rebecca until they formally met for the first time in September or October of 1997. Fritz later sued Rebecca in February or March of 1998 and obtained a $50,000 judgment against her in 2004.

9.     Mark Moery testified that he worked at the Tavern between July, 2004 and September 2005, first as a disc jockey, and then as a manager. Moery testified that Rebecca hired him and showed him what he needed to know regarding running the Tavern, "z" 'ing out the cash registers, preparing for opening and closing and how to handle the cash paid by the Tavern's customers. Moery testified that it was Rebecca who collected the cash and deposited it with the bank at the end of the week. Moery was told to call Rebecca at home if there was a problem in the Tavern. If Moery needed cash to pay for something the Tavern needed, it was Rebecca who gave it to him. Moery testified that Rebecca was his boss and that he spoke with Larry only when Larry had to fix a mechanical problem at the Tavern.

10.     Moery also testified that, as the Tavern's manager, he hired and fired

4

employees, handled receipts, had access to the safe, and performed many of the duties that Rebecca performed, but acknowledged that such managerial duties did not give him an ownership interest in the Tavern.

11.     Delores Neff testified that she was employed at the Tavern on and off for the last 12 years, staring first as a dancer from 1997-1998 and then, after a long absence, returning in 2006 as a bartender.  It was Rebecca who communicated the job duties to Delores.  Toby Davidson was the manager of the Tavern in 2006.  Delores testified on direct examination that Toby arrived at the Tavern in an intoxicated state while on duty as a manager and Rebecca fired him.  Delores testified that she was told that she worked for Rebecca, not Toby, that she never saw Larry fire anyone and that Rebecca told Larry what to do when he was at the Tavern.  Delores also testifed that Rebecca, and not Larry, told the managers what inventory to order for the Tavern and that Larry never told anyone what to do.  Delores testified that Rebecca routinely referred to the Tavern as "my bar" and that she (Rebecca) had the final "say so".

12.     Larry, Rebecca's husband, testified that he did not get involved in the tavern business until 1995 when the Tavern was transferred to Bearvon.  He stated that he loaned money to Rebecca for the Tavern between 1992 and 1994.  The October, 1994 loan evidenced by the $119,084 promissory note was not repaid as scheduled and Larry grew increasingly concerned that he would not be repaid.  Larry confirmed earlier testimony that, when Valor defaulted on its payments under the note, the Tavern was transferred to his corporation, Bearvon, on the advice of his counsel, and that the transfer was in satisfaction of the debt Valor owed to Larry.  Larry further confirmed that Bearvon assumed the mortgage owed to Roger Frazier.

13.     Larry testified that he did "everything but the bookkeeping" with respect to the Tavern after the transfer to Bearvon.  He testified that a lot of the employees that stayed on after the transfer had been Rebecca's employees and that Rebecca continued to manage them after the transfer.  He also testified that he was with Rebecca at the Tavern  when she fired Toby and he knew Toby was to be fired because he approved it.  He also testified that it was he who made the decision to allow Toby to return to work since he liked Toby and was friends with Toby's family.

14.     None of the exhibits admitted at trial show that Rebecca held herself out to be the owner of the Tavern after the transfer.  Rather, Plaintiffs' Exhibits 20 and 21 collectively show that Rebecca wrote checks drawn on Bearvon's account and made payable to the Indiana Department of Revenue for sales, food and beverage taxes owed in 2006 and signed all of the checks "Rebecca Taylor BK".  The "BK" was a notation for "bookkeeper". Plaintiffs' exhibits 22, 23, 24, 25 and 26 were 940 and 941 federal tax returns, all signed as "Rebecca Taylor BK" and the checks tendered in payment of the taxes were signed the same way.  If the return contained a box that read "print your title here" or "print name and title" it was filled in with the notation "bookkeeper", "Bookkeeper/Acct" or "Rebecca Taylor Acct/BK".  Bearvon's 2006 federal tax return was signed by "Larry T. Taylor" as "President/Owner".

15.     In January, 1998, Smith sued Rebecca in the Hamilton Superior Court (the "State Court"), alleging that Rebecca borrowed the money from him never intending to transfer an interest in the Tavern as promised.  On June 6, 2001, the State Court entered judgment in favor of Smith in the amount of $44,000.  Among the findings made by the State Court was that "[w]hen ownership of the VIP Show Club (the Tavern)

6

passed to Bearvon, the contract between Rebecca and Richard was made impossible because Rebecca was no longer able to convey ownership in the VIP Show Club to Richard".

16.    Rebecca filed a voluntary chapter 7 bankruptcy case on December 4, 2006 (the "Petition Date").  As of the Petition Date, Smith' judgment remained unpaid.

17.    Smith commenced this adversary proceeding by filing his Complaint Objecting to Discharge on December 20, 2007.  The Complaint seeks a complete denial of discharge of Rebecca's debts based on 11 U.S.C. §§727(a)(2)(A), (3) and (4).

## CONCLUSIONS OF LAW

Based on the above Findings, the Court now enters Conclusions of Law as follows:

1.    This matter is a core proceeding under 28 U.S.C. §157(b)(2)(J) and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

2.    Smith alleges that the discharge of Rebecca's debts should be denied under 11 U.S.C. §727a(2)(A), (3) and (4).  Smith must prove by a preponderance of the evidence the elements needed to deny Rebecca's discharge under §727.  See, *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002).

### *§727(a)(2)(A)*

3.    Section 727(a)(2)(A) prohibits the debtor from receiving a discharge if the debtor, with the intent to hinder, delay or defraud a creditor, concealed or has permitted to be concealed property of the debtor within one (1) year before the date of the bankruptcy

7

filing.

4.      Smith acknowledges that legal title to the Tavern was transferred to Bearvon in June, 1995 – well outside the magic "one year" period – but maintains that Rebecca should be denied a discharge by virtue of her "continuing concealment" of her retained beneficial interest in the Tavern that continued into a year before the Petition Date.

5.      A transfer of legal title "with attendant circumstances indicating that the bankrupt continues to use the property as his own" is a "concealment".  *In re Kauffman*, 675 F.2d 127, 128 (7th Cir. 1981) ("interpreting Section 32(c)(4) of the Bankruptcy Act); *In re Olivier*, 819 F.2d 550, 553 (5th Cir. 1987) ("Concealing property for purposes of section 727(a)(2)(A) can be accomplished by a transfer of title coupled with the retention of benefits of ownership"); *In re Hayes,* 229 B.R. 253, 259-260 (1st Cir BAP, 1999).

6.      A debtor can retain a "beneficial" interest in property in which he or she has transferred legal title to another if the debtor "continues to use, enjoy, and control the property transferred as if the property remained his own" (citations omitted), *In re Penner*, 107 B.R. 171, 175 (Bankr. N. D. Ind. 1989).  A debtor was found to have retained a beneficial interest in a residence he transferred when he continued to live in the residence and make its mortgage payments, *Rozen v. Bezner*, 996 F.2d 1527, 1532 (3rd Cir. 1993), or continued to live in the residence rent free but still maintain the property and pay insurance on it.  *In re Olivier,* 819 F.2d 550 (5th Cir. 1987).

7.      The party seeking to deny discharge must not only show that the concealment of the retained beneficial interest continued during the one year period preceding the bankruptcy, but must also show that the concealment was done with the intent to

8

hinder, delay or defraud creditors. Thus, both an act (concealment) and improper intent within the one-year period is required under §727(a)(2)(A). *Rozen*, 996 F.2d at 1532.

8.      Since debtors rarely admit fraudulent intent, evidence of fraudulent intent can be inferred from the circumstances, including the circumstances surrounding the initial property transfer that resulted in the debtor's retained beneficial ownership.  The existence of certain factors  – "badges of fraud" – are indicative of whether the debtor possessed the requisite fraudulent intent.  *Penner*, 107 B.R. at 175-76.  These "badges of fraud" include (1) the lack of consideration for the property transferred; (2) the existence of a family or other close relationship between the transferor and the transferee; (3) the transferor's retention of the possession, control, benefits or use of the property transferred; (4) the financial condition of the debtor (transferor) both before and after the transfer; (5) the cumulative effect of the transaction the course of conduct after the onset of financial difficulties or threat of suit by creditors; and (6) the chronology and timing of the transfer in question.  *Id.*

9.      The State Court conclusively determined in June, 2001 that Rebecca had no *legal ownership interest* in the Tavern after the transfer and thus, specific performance of a transfer of a  48% interest to Smith in exchange for the $50,000 in loans Smith made was an impossibility.  The June, 2001 State Court judgment cannot be collaterally attacked, and no evidence has been presented to suggest that Rebecca reacquired a legal ownership interest in the Tavern since 2001.

10.     Smith's "continuing concealment" theory starts with the premise that the June, 1995 transfer itself was fraudulent in that Rebecca transferred Valor to Bearvon to

9

hinder, delay and defraud her creditors.  Nothing in the record supports this premise.
What the record does show is that no judgments had been taken against Valor or
Rebecca as of the date of the transfer.  Furthermore, as of the date of the transfer,
Valor's (and therefore Rebecca's) largest creditors were her husband Larry and Roger
Frazier, who were owed collectively a minimum of $200,000.  ($119,000-plus  owed to
Larry and at least $87,000 owed to Frazier).   As of the date of the transfer, Smith was
owed $20,000.  Rebecca herself was owed approximately $55,000.  Brian Eads had
asserted a 48% interest in Valor for which he later sued with the outcome of that
litigation resulting in a finding that Eads had no ownership interest in Valor.  But even
the Eads lawsuit had not been filed as of the date of the transfer.    Rebecca had not
even met Larry Fritz as Fritz did not invest $50,000 until approximately two years later,
and didn't obtain a judgment against Rebecca until at least six years after that. So, of
the roughly $282,000 owed to Valor's creditors as of June, 1995, Smith's share was
about 7%.  [1]   The Court finds it incredulous that Rebecca would cause Valor to transfer
its assets for the purpose of evading a creditor to whom only 7% of its outstanding debt
was owed.  And, contrary to Smith's assertions at trial that Rebecca's "waiver" of her
$55,000 - plus claim was intended to defraud creditors, the Court finds that Rebecca's
relinquishment of a $55,000 claim (for which she most likely would never get paid) in
exchange for satisfaction of over $200,000 in debt (the note owed to Larry and the
mortgage obligation owed to Roger Frazier) was not made with any such intent or

---

[1] The record shows that, as of June 2, 1995 transfer, Valor owed the following: (1) Rebecca $55,916,03; (2) Larry Taylor, $119,084.00; (3) Roger Frazier, a minimum of  $87,048.91 and possibly as much as $250,000; and (4) Smith, $20,000.  Even the most conservative figure places the aggregate debt at over $282,000, of which  Smith's share was approximately 7%.  ($20,000 divided by $282,000)

purpose. Thus, the Court concludes that the June, 1995 transfer was not motivated by Rebecca's desire to divest herself of her interest in Valor in order to defraud her creditors. Cf, *In re Basso*, 397 B.R. 556 (1st Cir. BAP 2008) (transfer occurred after entry of judgment against debtor); *Olivier*, 819 F.2d at 551 (transferred occurred two days after debtor was in auto accident which ultimately resulted in judgment against him). This conclusion is further bolstered by the fact that the transfer from Valor to Bearvon was done on the advice of counsel.

11.    The Court further concludes that Rebecca did not retain a beneficial interest in the Tavern within a year of the Petition Date and therefore had no secret beneficial interest to conceal. The fact that Rebecca managed the Tavern in the same manner after the transfer as she had before the transfer is not evidence that she continued to use, enjoy and control the Tavern as if it had never been transferred. Rebecca did what managers and bookkeepers do.....hire and fire employees, access the safe where cash is kept, determine what inventory needed to be ordered, handle bank deposits, kept the books, wrote checks for sales, food and beverage taxes. Even though she performed these duties, she was not paid by Bearvon and she derived no benefit from the Tavern for her work. There is no evidence in the record that Rebecca, after the transfer, co-signed a loan for the Tavern, pledged it as collateral, derived an income stream from it and used it to pay her personal expenses, or took any other actions that would be consistent with "incidents of ownership". Her references to the Tavern as "her bar" were more an indication that she was "in charge" of the Tavern rather than an assertion of ownership. Mark Moery testified that Rebecca was the one who he took instruction from and that he had little interaction with Larry Taylor, but Moery was

11

employed at the Tavern only until September, 2005, outside the one-year period preceding the bankruptcy filing. The only testimony that pertained to events occurring within the one year period was that of Delores Neff whose testimony regarding the firing of Toby Davidson was contradicted by Larry who testified that it was he that made the decision to file Toby and also made the decision to rehire him. Firing employees is what managers do. Even if the decision to fire Toby was Rebecca's, it is not determinative of a retained interest, as Mark Moery performed similar managerial duties but acknowledged that it did not give him an ownership interest in the Tavern. The Court concludes that Smith failed to prove by a preponderance of the evidence that Rebecca held a beneficial or "secret" interest within one year of the filing of her petition. As such, the Court concludes that the discharge should not be denied under §727(a)(2)(A).

### *§727(a)(3)*

12.     Section 727(a)(3) denies the debtor a discharge of debts if the debtor has concealed or failed to keep records from which the debtor's financial condition or business transactions might be ascertained. Smith's complaint alleges that Rebecca concealed, destroyed, mutilated falsified or failed to keep or preserve recorded information from which her financial condition or business transactions relating to the Tavern might be ascertained. No evidence was presented with respect to this claim, and the Court has already determined that Rebecca retained neither a legal nor a beneficial ownership interest in the Tavern. Accordingly, Smith's §727(a)(3) claim fails.

12

### *§727(a)(4)*

13.     Finally, Section 727(a)(4) prohibits the entry of discharge if the debtor knowingly and fraudulently in or in connection with the case made a false oath or statement. Smith's complaint alleges that Rebecca failed to disclose her beneficial interest in the Tavern, but as the Court has concluded, she retained no beneficial interest in the Tavern as of a year before the Petition Date.  The complaint also alleges that Rebecca gave false testimony at her Rule 2004 examination regarding her involvement in the Tavern and her prior business relationship with Smith.  At trial, Smith's counsel recalled Rebecca to testify wherein he attempted to impeach her testimony by referring back to her responses to questions asked in the Rule 2004 examination conducted in 2007 and comparing them to inconsistent testimony she gave at trial.   Those questions for which Rebecca gave allegedly inconsistent responses related to her education level and her handling of cash at the Tavern.  A false oath for Section 727(a)(4) purposes must be with respect to a fact material to the bankruptcy.  See, *In re Chavin*, 150 F.3d 726,727 (7th Cir. 1998).  The fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings or existence and or disposition of property. *In re Chalik,* 748 F.2d 616, 618 (11th Cir. 1984); *In re Calder*, 907 F.2d 953,955 (10th Cir. 1990).  Rebecca's educational level and her handling of cash from the Tavern falls under none of these categories and therefore if she made a false oath, it was not as to a fact that was material to her bankruptcy case.  Furthermore, Smith bears the burden of proving the false oath was made knowingly and fraudulently.  Rebecca testified in trial that she either had forgotten or did

13

not recall how she had testified in her Rule 2004 examination and therefore appears to have lacked the requisite fraudulent intent.   Smith's §727(a)(4) claim also fails.

14.    Rebecca did not retain a beneficial interest in the Tavern within a year before the Petition Date, and thus had no such interest to conceal.  Nor did she knowingly and fraudulently make a false oath with respect to a fact that was material to her bankruptcy case.  Accordingly, Smith's claims against her fail and she will be granted her discharge.  A judgment entry will follow.

# # #

Distribution:
Bret Clement, Attorney for the Plaintiff
Michael E. Farrer, Attorney for the Defendant
Edward B. Hopper, II, Attorney for the Defendant